

U.S. Department of Justice

*United States Attorney
Eastern District of New York*

RTP:JAM/FTB
F.# 2016R02202

*271 Cadman Plaza East
Brooklyn, New York 11201*

January 24, 2022

By ECF and Email

The Honorable Carol B. Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Patrick McCrann
            Docket No. 21-CR-467 (CBA)

Dear Judge Amon:

      The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is currently scheduled for January 31, 2022. On October 4, 2021, the defendant waived indictment and pleaded guilty to an information, charging a violation of the Travel Act pursuant to 18 U.S.C. § 1952(a)(3). As delineated in the written plea agreement and as stipulated by the defendant, the government estimates that the defendant's advisory range of imprisonment per the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") is 18 to 24 months. In his January 10, 2022 submission (the "defense submission"), the defendant requests a non-incarceratory sentence.

      For the reasons set forth in the PSR and herein, the government recommends that the Court impose a sentence within the advisory range of imprisonment of 18 to 24 months contemplated under the plea agreement to address (1) the seriousness of the defendant's conduct, (2) the defendant's disregard for the law and abuse of his position, and (3) the need for deterrence. See 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C).

  I.     Factual Background

      The PSR accurately summarizes the offense conduct, a commercial bribery scheme that began in the wake of Hurricane Sandy. See PSR at ¶¶ 4-62. The defendant and four separately-charged defendants – Richard Zavada, Devraj Balbir, Ricardo Garcia and Jevan Seepaul – were employed by National Grid plc ("National Grid"), a publicly traded

utilities company, and solicited and received bribe payments from vendors who did business with National Grid. Most notable among these vendors were two companies co-owned by Cooperating Witness 1 ("CW-1") and Cooperating Witness 2 ("CW-2") (collectively, the "Contractor"). See PSR at ¶¶ 4-11. Notably, between December 2014 and February 2020, the Contractor received more than $50 million in payments from National Grid.

The defendant was employed in National Grid's Facilities Department for approximately 33 years, and at times was responsible for managing National Grid's facilities on Long Island. See PSR at ¶ 5.

### A. Overview of the Investigation and the Bribery Scheme

In January 2020, the FBI received information alleging that CW-1 and CW-2 paid bribes on behalf of the Contractor to various representatives of National Grid, including the defendant, to receive work from National Grid. See PSR at ¶ 11. In or about July 2020, CW-1 and CW-2 began cooperating with the government's investigation, including meeting with FBI special agents on several occasions. Id. CW-1 and CW-2 admitted having made bribe payments to the defendant and other National Grid employees to secure work from National Grid and to receive other favorable treatment for the Contractor relating to its work at National Grid. See PSR at ¶¶ 11-17. This favorable treatment included, but was not limited to, the following: providing non-public information about competitors' bids, awarding no-bid contracts, structuring the value of contracts to avoid additional approval requirements and providing favorable performance reviews. Id. CW-1 and CW-2 further acknowledged that they continued to pay bribes for fear that, in the absence of such payments, the defendant would harm the Contactor's ability to continue to work for National Grid. Id. Further, the defendant had the authority to slow or stop disbursement of project funds to the Contractor, provide negative performance reviews regarding the Contractor's work or otherwise claim that the Contractor's work did not meet contractual specifications. Id. As such, the defendant was in a position to cause significant economic harm to the Contractor, if it failed to pay the kickbacks the defendant demanded.

### B. The Defendant's Role in the Bribery Scheme

In or about 2013, the Contractor began submitting bids to perform work for National Grid. In or about 2014 or 2015, both the defendant and Richard Zavada, another manager in the Facilities Department, indicated to CW-1 that they were unhappy with a vendor ("Vendor-1"), which had performed work for National Grid. See PSR at ¶ 13. Based on these conversations, CW-1 suspected Vendor-1 had been making bribe payments to the defendant and Zavada. CW-1's suspicions were confirmed during a series of meetings with the defendant. During the meetings, the defendant requested a kickback of 7% of the total payments that the Contractor received for all jobs performed for National Grid in which the defendant was involved. See PSR at ¶¶ 11-14. When the Contractor began performing work for National Grid that the defendant supervised, the defendant made clear that he could elect to use vendors other than the Contractor to perform work for National Grid. Id. Indeed, CW-1 and CW-2 understood that the defendant and other National Grid supervisors had the

2

authority to select any approved vendor, without relying on a bidding process, for contracts valued at less than $50,000. See PSR at ¶ 11-15. CW-1 and CW-2 further understood, based on their conversations with the defendant and Zavada, that National Grid supervisors could make the performance of the Contractor's job and the receipt of payment from National Grid very difficult for the Contractor if the bribes they sought were not paid. Id. As such, CW-1 and CW-2 agreed to make bribe payments to the defendant, Zavada and ultimately to Balbir, Garcia and Seepaul.

### C. The Defendant's Communications and Interactions with the Contractor in Furtherance of the Bribery Scheme

The defendant repeatedly communicated with CW-1 or CW-2 via text message to solicit bribe payments from the Contractor while the Contractor was performing work for National Grid. In these communications, the defendant used coded language to hide his criminal conduct, referring to cash bribes as food items received from "Mary." The communications below, which are described in the PSR in paragraphs 26-36, reflect a non-exhaustive sample of those communications.

For example, on or about September 2, 2016, the defendant and CW-1 had the following text message exchange, in which the defendant was indicating to CW-1 that a recent bribe payment was insufficient, and CW-1 responded by stating that the next bribe payment would be larger:

| | |
|---|---|
| Defendant: | Sandwich was light on the meat |
| CW-1: | She's working on it |
| Defendant: | K a little concerned as Mary always make a great sandwich |
| Defendant: | Have a great weekend |
| CW-1: | I rushed her but I'll ask for a nice one next time |

On or about November 17, 2016, the defendant and CW-1 had the following text message exchange, in which CW-1 was inquiring about the status of a project for National Grid:

| | |
|---|---|
| CW-1: | Hey forgot to ask any updates with [facility belonging to National Grid] drainage? |
| Defendant: | I'll check with Mary and get back to you |
| CW-1: | I'm almost positive she's available tomorrow[.] She's supposed to confirm this afternoon |
| Defendant: | Great |

The defendant's response with a reference to "Mary" indicates his willingness to assist the Contractor with the project upon his receipt of a bribe payment.

On or about January 26, 2017, the defendant and CW-1 had the following text message exchange:

3

| | | |
|---|---|---|
| Defendant: | | How is my friend [M]ary – maybe she would like to tour garden city |
| CW-1: | | She's been good |
| Defendant: | | She needs to step it up. |

Here, the defendant was requesting another cash bribe from the Contractor ("How is my friend [M]ary") and further indicating the Contractor needed to provide a bribe in the near future ("She needs to step it up").

In addition to cash payments, CW-1 and CW-2 also paid for renovations made to the defendant's home in Upstate New York. See PSR at ¶ 35. The renovations were paid for with two checks: one in the amount of $40,000 issued on or about September 10, 2018, and another in the amount of $50,000 issued on or about November 14, 2018. Id.

### E. The Defendant's Arrest and Plea

On June 17, 2021, the defendant and the other aforementioned separately-charged defendants were arrested and charged by complaint with violating the Travel Act. On October 4, 2021, following plea negotiations with the government, the defendant waived indictment and pled guilty to an information charging a violation of the Travel Act, pursuant to 18 U.S.C. § 1951(a)(3). The executed plea agreement contained a forfeiture stipulation pursuant to which the defendant agreed to disgorge his profits from the bribery scheme, including a money judgment of $200,000.

## II.   Sentencing Range and Guidelines Calculation

The Travel Act Violation carries a maximum possible term of imprisonment of five years. The government submits that the Guidelines calculation set forth below, outlined in the PSR and stipulated to by the parties in the plea agreement, should be applied. This results in an adjusted offense level of 15. However, the PSR finds that the defendant is in Criminal History Category II because he committed the instant offense while on probation for a 2014 misdemeanor conviction, which results in an advisory Guidelines range of imprisonment of 21 to 27 months. See PSR at ¶¶ 81-85. The government agrees that the PSR's calculation as to the defendant's criminal history category is correct, but the government does not seek a sentence within the range calculated in the PSR. Rather, consistent with the plea agreement, the government respectfully requests a sentence within the stipulated range in the plea agreement, which provides for a range of imprisonment of 18 to 24 months.

## III.   Argument

### A.   The Offense Conduct is Serious

The defendant's criminal conduct was serious. By soliciting and accepting bribes, the defendant not only abused his managerial position with National Grid, but also distorted the bidding process and execution of National Grid contracts. While the contracts

4

involving the Contractor appear generally to have been at market value and not to have been inflated to any material extent, the defendant's conduct necessarily affected National Grid's business and prevented other local vendors from participating in a fair, open procurement process. Beyond the parties immediately affected, this type of criminality also affects taxpayers and consumers at large.

The defendant's intelligence, education and ability to influence others through his position make his crime all the more inexcusable. Rather than arising from necessity or adverse circumstances, the defendant's criminality was instead the result of hubris and greed. Additionally, while the defendant's sentencing memorandum laments the collateral consequences of his conviction, these consequences are entitled to very little, if any, weight in imposing sentence. See 28 U.S.C. § 994(d) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to…socioeconomic status of offenders."); U.S.S.G. § 5H1.10 (socioeconomic status not relevant); see also U.S.S.G. § 5H1.2 (vocational skills and education not ordinarily relevant); U.S.S.G. § 5H1.5 (employment record not ordinarily relevant); U.S.S.G. § 5H1.6 (family ties and responsibilities not ordinarily relevant). Courts have agreed. See, e.g., United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); United States v. Musgrave, 761 F.3d 602, 608–09 (6th Cir. 2014) (impermissible for the district court to rely heavily on the fact that the defendant had already "been punished extraordinarily" through years of legal process, the loss of his CPA license, and his felony conviction). As the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999). The Court should reject the defendant's suggestion that the defendant or any person from a privileged background should receive a lesser sentence than others due to "reputational harm," "professional harm," or "lost business opportunities."

B. The Need for Deterrence is High

The Court's sentence must act as a deterrent. While the defendant will not likely be in a position to commit similar crimes in the future, the Court's sentence must deter similarly situated individuals from engaging in such behavior. Because the instant offense is an economic crime and involved "rational, cool, and calculated" decision making over a period of time, rather than "sudden crimes of passion or opportunity, [it is a] prime candidate for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). The need for deterrence is particularly acute in this case, which involves commercial bribery, as such conduct is endemic in the Eastern District, particularly on Long Island. The defendant's sentence must serve to protect the integrity of the commercial environment in this district and help ensure that businesses compete on a level, honest playing field.

C. The Defendant's Acceptance of Responsibility and Mitigating Factors are Noteworthy

Several mitigating factors should be considered by the Court when fashioning an appropriate sentence.

First, the defendant agreed to self-surrender, waive indictment and plead guilty in a timely manner, thereby saving both the government and the Court's time and resources in litigation. While the defendant has already received a downward adjustment in the Guidelines for acceptance of responsibility, his contrition may also be considered by the Court as relevant to his "history and characteristics." 18 U.S.C. § 3553(a)(1), see also United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012) (stating that acceptance of responsibility may be considered during the 3553(a) analysis and "further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); accord United States v. Kaziu, 559 F. App'x 32, 39 (2d Cir. 2014) (summary order).



Third, the defendant has significant health issues that will make a prolonged period of incarceration difficult, particularly during the COVID-19 pandemic. As noted in the PSR, the defendant's health may be considered a mitigating factor at sentencing. See PSR at ¶¶ 90-102.

IV. Forfeiture

The defendant agreed in his plea agreement to a forfeiture amount of $200,000. This figure represents the total value of illicit payments accepted by the defendant during the course of the charged conduct. Accordingly, the government respectfully requests that the Court enter a forfeiture money judgment in the amount of $200,000.

V. Restitution

On January 21, 2022, National Grid filed a brief as an interested party, arguing that it is entitled to restitution under the Mandatory Victim Restitution Act ("MVRA"). See generally 18 U.S.C. § 3663A. Specifically, National Grid seeks reimbursement for two categories of expenses: First, National Grid seeks the repayment of all compensation (salary and benefits) paid by National Grid to the defendant for the time period covered by the defendant's offense of conviction. Second, National Grid requests reimbursement for the legal fees it incurred in responding to requests for information from the government (both formal and informal) during the course of the investigation that resulted in the charges in this case. For the reasons set forth below, the government generally agrees that National Grid is entitled to the second category of restitution (reimbursement of legal fees). The first category of restitution – 100% of all compensation paid to the defendant – is difficult to justify under prevailing caselaw based on the facts in this case.

As an initial matter, the government agrees that National Grid qualifies as a "victim" under the MVRA. The MVRA defines "victim" as any "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." Among the offenses for which the MRVA requires restitution are all Title 18 "offense[s] against property," including "any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(ii). The Second Circuit recently clarified that courts should look to the "facts and circumstances" of the crime of conviction to determine whether it qualifies as an "offense against property" under the MVRA. See United States v. Razzouk, 984 F.3d 181, 186-88 (2d Cir. 2020). This includes, at a minimum, the manner in which the crime was committed, including whether the crime was committed by "fraud and deceit." See id. Thus, even if the

[footnote redacted]

deprivation of property is not expressly an element of the underlying crime, restitution may still be warranted upon a finding of losses resulting from the crime. See id.

In this case, the defendant, as described above, corrupted National Grid's contracting procedures in exchange for bribe payments. Courts in this district have held that employers may recover compensation paid to compromised employees under the MVRA in similar circumstances. See, e.g., United States v. Bahel, 662 F.3d 610, 649 (2d Cir. 2011) ("There is no question that a portion of an individual's salary can be subject to forfeiture where, as here, an employer pays for honest services but receives something less."); United States v. Donaghy, 570 F. Supp. 2d 411, 429 (E.D.N.Y. 2008) (Amon, J.) ("Whereas here, the defendant is an employee who was compensated under the false pretense that he was rendering honest services to his employer, the correct measure of loss is the amount of the defendant's compensation that was paid for the portion of his services that were dishonest."). This is true even if – as here – the defendant's conduct did not result in any independent cognizable losses to the victim. See, e.g., United States v. Napout, 15-CR-252 (PKC), 2018 WL 6106702, *9-*12 (E.D.N.Y. Nov. 20, 2018) (finding no cognizable loss to soccer organization in terms of inflated contract prices as a result of bribes to defendants, but awarding restitution in the amount of 20% of defendants' compensation during the relevant time period).[2]

Determining the portion of a corrupt employee's compensation under the MVRA that is recoverable is generally acknowledged to be a difficult process. See, e.g., United States v. Coffin, et al., 09-CR-481 (ARR), 2011 WL 4962395, at *4 (E.D.N.Y. Oct. 18, 2011) ("The amount of restitution that each defendant owes is inherently difficult to ascertain."). The goal is to identify the "percentage [of compensation] representing the difference between the value of services rendered by [the] defendant and an honest employee." Id. at *2. In the absence of any independent losses to the victim employer, at least one court in this district declined to award any reimbursement for compensation paid to an employee who took bribes in part on the ground that doing so would necessarily be too arbitrary an exercise. See United States v. Adorno, 950 F. Supp. 2d 426, 431 (E.D.N.Y. 2013) ("[I]n this case, the parties' submissions make clear that any estimate would be too arbitrary to sustain and that a hearing to achieve a non-arbitrary result would involve protracted proceedings that,

---

[2] As noted above, National Grid is correct in its submission when it indicates that the government's investigation has not produced evidence that contract prices were inflated to any material degree as a result of the bribe payments in this case. Compare Razzouk, 984 F.3d at 189-90 (affirming multi-million dollar restitution award to victim utility company based on findings of losses substantiated by two forensic accounting firms in the form of documented overpayments for contracts tainted by bribes); see generally United States v. Finazzo, 850 F.3d 94, 117-18 (2d Cir. 2017) (vacating restitution order in Travel Act bribery case on the ground that the district court did not use a sound methodology to determine loss and reiterating that – in the absence of specific evidence – courts cannot assume that kickback payments in exchange for the award of contracts necessarily result in inflated prices for those contracts – rather, the evidence must establish a "direct correlation" between the bribe payments and any claimed losses).

8

even if conducted, might well not produce a non-arbitrary result."). Other courts have been more comfortable awarding a portion of compensation as restitution, but, in those cases, the percentage of compensation identified has rarely exceeded 20%-25%. See, e.g., Napout, 2018 WL 6106702 at *2-*3, *12 (awarding 20% of compensation paid to executives of international soccer organization as restitution upon a finding that it would be "unduly complex" to delineate which portions of compensation were for dishonest services as opposed to honest services where defendants had violated their "core responsibility" to the organization and this violation "permeated all aspects of their activities"); Coffin, 2011 WL 4962395 at *5 (awarding varying percentages (ranging from 10% to 25%) of compensation for multiple defendants based on consideration of a number of factors, including "(i) the amount of bribes [each defendant] received; (ii) the amount of intended loss [each defendant's] scheme(s) created; (iii) the length of time [each defendant's] scheme(s) lasted; (iv) [each defendant's] level of seniority at [victim utility company]; and (v) [each defendant's] level of participation in the scheme(s) relative to the other defendants"). The government is unaware of any case in this circuit in which 100% of all compensation has been awarded as restitution in circumstances similar to the facts of this case.

The MVRA also provides for compensation of "other expenses incurred during the [victim's] participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). In the Second Circuit, this has generally been understood to encompass attorneys' fees incurred by victims in responding to requests by the government for information related to a criminal investigation. See Napout, 2018 WL 6106702 at *4-*5, *8-*9. This is true, even after the Supreme Court's decision in Lagos v. United States, 138 S. Ct. 1684 (2018), which limited restitution for investigative costs to only those costs that the victim incurred at the request or the invitation of the government. See United States v. Razzouk, 11-CR-430 (ARR), 2021 WL 1422693, *2-*3 (E.D.N.Y. Apr. 15, 2021) (finding that Lagos did not abrogate existing Second Circuit law that investigative costs, including attorneys' fees are eligible – in certain circumstances – for reimbursement through restitution).

As such, the government agrees that an award of restitution to National Grid to reimburse it for reasonable attorneys' fees it incurred is warranted. The government requests that any award of restitution for attorneys' fees be joint and severable among the five identified defendants in National Grid's January 21, 2022 submission, as well as CW-1 and CW-2, who have pleaded guilty to related offenses in separate proceedings that remain under seal at this time.

## Conclusion

For the reasons set forth in the PSR and herein, the government respectfully requests that the Court impose a sentence within the advisory range of imprisonment of 18 to 24 months contemplated by the parties' plea agreement.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/
Artie McConnell
F. Turner Buford
Assistant U.S. Attorneys
(718) 254-7000


cc:   Andrew Karpf, Esq. (by ECF)
      Michelle B. Malko, United States Probation Officer (by E-mail)